# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BRENDA KAY SANDERS, as Guardian | ) | |
| of CHARLES RAY, | ) | |
| | ) | Case No. 14-CV-569-JED-FHM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STANLEY GLANZ, SHERIFF OF TULSA | ) | |
| COUNTY; CORRECTIONAL | ) | |
| HEALTHCARE MANAGEMENT OF | ) | |
| OKLAHOMA, INC.; CORRECTIONAL | ) | |
| HEALTHCARE MANAGEMENT, INC.; | ) | |
| CORRECTIONAL HEALTHCARE | ) | |
| COMPANIES, INC.; and SHARISSA | ) | |
| CLAXTON, LPN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

### I. Background

Plaintiff, as Guardian of Charles Ray (Ray), who is alleged to be an incapacitated person,

brings this lawsuit against the defendants for injuries suffered from a severe assault on Mr. Ray

at the David L. Moss Criminal Justice Center (the Jail). The following summarizes facts that are

alleged in plaintiff's Complaint and are taken as true in analyzing the defendants' dismissal

motions under Fed. R. Civ. P. 12(b)(6).

Mr. Ray was booked into the Jail on September 21, 2012. At the time, he advised the

booking nurse, Sharissa Claxton, that he had recently been treated for serious mental health

disorders at the Jail and had been prescribed antipsychotic medication by Jail medical staff. His

Jail medical records reveal a history of suicidal ideation as well as erratic, psychotic, and

combative behavior. The Jail's psychiatrist, Stephen Harnish, had diagnosed Ray with mood

disorders and prescribed several antipsychotic medications for Ray. Notwithstanding this

knowledge and the requirements of Oklahoma Jail Standards that mentally ill inmates shall be separated from other prisoners where they can be observed frequently, the booking nurse assigned Ray to a general population pod and failed to take any action to ensure his serious mental health needs were met.

Three days after he was housed in general population, Ray was viciously assaulted, over a lengthy period of time, by other inmates in the Jail shower. He was found lying on the floor, bleeding from his head, face, mouth and left side of his skull, and his left eye was swollen shut. The assault almost killed Ray and left him severely and permanently incapacitated. The length of the assault and the severity of the injuries establish that there was virtually no supervision provided for Ray. As an inmate with serious, known mental health needs, he was not adequately classified, treated, housed, supervised, monitored, or protected from obvious risks of serious harm, in deliberate indifference to Ray's health and safety.

After Ray was severely beaten at the Jail, the Tulsa County Sheriff's Office (TCSO) intentionally released Ray, purportedly on his Own Recognizance (OR), so that the County would not be responsible for his extensive medical bills. Ray never signed an OR release; he did not give consent for one to be signed; and he was incapable of giving informed consent after he was found nearly beaten to death and severely brain damaged. Releasing inmates on false OR in order to avoid medical costs is a common practice, amounting to a policy or custom, at the Jail, in deliberate indifference to the health and safety needs of inmates like Ray.

All defendants have moved for dismissal. On their face, the motions are purportedly premised upon Fed. R. Civ. P. 12(b)(1), (2), (4), (5) and (6), and *Okla. Stat.* tit. 12, § 19.

## II.     Discussion

### A.     Correctional Healthcare Management, Inc. and Correctional Healthcare Management of Oklahoma, Inc. (CHM defendants)

The CHM defendants move to dismiss on the ground that, as of their merger into defendant Correctional Healthcare Companies, Inc. (CHC), effective December 31, 2011, the CHM defendants ceased to exist. The CHM defendants thus argue that this Court lacks jurisdiction. This Court has previously denied a similar motion, stating:

> [P]laintiffs note that the CHM defendants' argument that they ceased to exist as of December 31, 2011 is inconsistent with a number of Corporate Disclosure Statements filed by those defendants in this Court after December 31, 2011. (*See* Doc. 17 and 18 in Case No. 11-CV-720; Doc. 13 in Case No. 11-CV-755; Doc. 24 in Case No. 12-CV-68; Doc. 76 in Case No. 11-CV-457; and Doc. 20 in Case No. 11-CV-696). The Court also notes that CHMO filed an Answer in another case in this Court on May 20, 2013, almost 17 months after it allegedly ceased to exist. (Doc. 22 in Case No. 13-CV-112). In yet another case, CHMO filed an Answer on June 17, 2013, *after* plaintiffs' initiated this lawsuit. (*See* Doc. 6 in Case No. 13-CV-303). Plaintiffs also assert that dismissal of the CHM defendants is improper because CHMO entered into an amendment to the Health Services Agreement for the Tulsa County Jail, which was effective July 1, 2012, six months *after* the CHM defendants assert that they ceased to exist. (Doc. 35-7). That amendment was signed on behalf of both CHM and CHC on June 27, 2012, and the recitals to the amendment provided that "CHMO as part of its corporate re-branding has merged into [CHC]; and . . . [CHC] and CHMO have common corporate ownership, officers and directors." (*Id.*).
>
> The Court recognizes that the Colorado statute appears to support the CHM defendants' argument. However, the CHM defendants have not explained the inconsistencies in their representations to the Court in filings in other cases, nor have they provided any on point legal authority to support their argument for dismissal where the allegedly non-existent entities continued to hold themselves out as existing entities after they merged. At this time, the Court does not have enough information to determine whether the exclusion or inclusion of the CHM defendants is appropriate in this case.

*Revilla v. Glanz*, No. 13-CV-315-JED, 2014 WL 1056694 (N.D. Okla. Mar. 18, 2014) (unpublished).

In the March 18, 2014 unpublished *Revilla* decision, the Court denied the dismissal motion, without prejudice, and directed that "[s]hould the CHM defendants wish to reassert a dispositive motion on this issue at a later date, they should include an explanation for the discrepancies in their post-merger representations to the Court regarding their status as separate existing entities, and they also shall provide legal authorities supporting their argument for dismissal on the grounds asserted." *Id.*

Although the CHM defendants' motion in this case was filed over seven months after the *Revilla* order on the same issue, they have not provided any explanation whatsoever for the discrepancies in their post-merger representations and contracts, and they have not provided any federal legal authority that establishes that dismissal pursuant to Fed. R. Civ. P. 12(b)(1) or (2) (the grounds asserted by the CHM defendants in their motion) is appropriate under the circumstances.[1]

It appears that the CHM defendants may have a legitimate point, if they ever supply the necessary information and authorities. It certainly makes sense to avoid duplication of effort as to three entities where one may suffice. However, just as the Court has no obligation to be an advocate for a pro se defendant, the Court has even less incentive or requirement to do the research or supply arguments for defendants who are represented by counsel, and the undersigned declines to do so at this time. The CHM defendants' dismissal motion (Doc. 15) is denied.

---

[1]    In reply, the CHM defendants attempt to brush off the Court's analysis in *Revilla* by asserting that "[a]t the time of those prior cases [referenced in *Revilla*], this merger had not yet taken effect." (Doc. 27 at 2-3). That gloss does nothing to address *Revilla's* citation to filings and contracts made by the CHM defendants *after* the merger was purportedly effective. In addition, neither party has provided the Court with information as to whether there was still in effect any Jail contract with the CHM defendants. Thus, at this stage, the Court will take as true the Complaint's averments, which state that the CHM defendants were responsible for providing medical services and medication to Mr. Ray while he was at the Jail. (Doc. 2 at ¶¶ 8, 10).

### B.    Correctional Healthcare Companies, Inc. (CHC)

#### 1.    Inapplicable Grounds for Dismissal

CHC cites Fed. R. Civ. P. 12(b)(2), (4), (5), and (6) in support of its dismissal motion. However, the Court has not identified in its briefing any arguments or bases for dismissal based upon a lack of personal jurisdiction under subsection (2), insufficient process under subsection (4), or insufficient service of process under subsection (5), and the motion is denied to the extent it cites those subsections of Rule 12(b).

#### 2.    Dismissal Standards

With respect to the Rule 12(b)(6) motion, the applicable standards are well-established. In considering a Rule 12(b)(6) dismissal motion, a court must determine whether the plaintiff has stated a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). The Federal Rules of Civil Procedure require "a short and plain statement of the claim to show that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The standard does "not require a heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 555-56, 570 (citations omitted). *Twombly* articulated the pleading standard for all civil actions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). For the purpose of making the dismissal determination, a court must accept all the well-pleaded factual allegations of the complaint as true, even if doubtful, and must construe the allegations in the light most favorable to claimant. *See Twombly*, 550 U.S. at 555; *Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

### 3.    Under Color of Law

CHC first argues that the plaintiff's allegations do not establish that CHC was acting under color of state law for purposes of § 1983 liability.  The Court disagrees.  The Complaint specifically alleges that CHC was responsible for Jail medical services, and was in part responsible for creating and implementing policies, practices, and protocols that govern the provision of medical and mental health care to inmates at the Jail.  (Doc. 2 at ¶¶ 9).  Those allegations are sufficient to plausibly allege that CHC was acting under color of law for purposes of § 1983 liability.  *See West v. Atkins*, 487 U.S. 42, 54 (1988) ("a physician employed by North Carolina to provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury. Such conduct is fairly attributable to the State").

In *West*, an inmate brought an action under 42 U.S.C. § 1983, alleging that he was given constitutionally deficient medical care in violation of the Eighth Amendment.  The district court granted summary judgment to the physician on that court's determination that the physician was not acting under color of state law when he treated the inmate's injury.  487 U.S. at 45-46.  The Fourth Circuit Court of Appeals, en banc, affirmed the district court's dismissal of the inmate's complaint.  That determination conflicted with Eleventh Circuit decisions, which had concluded that "a physician who contracts with the State to provide medical care to prison inmates, even if employed by a private entity, acts under color of state law for purposes of § 1983."  *See id.* at 47.  The Supreme Court granted certiorari in light of the conflict.

The Supreme Court reversed the Fourth Circuit's en banc determination in *West*, concluding that the physician acted under color of law:

> We now make explicit what was implicit in our holding in *Estelle [v. Gamble*, 429 U.S. 97 (1976)]*: Respondent, as a physician employed by North

Carolina to provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury. Such conduct is fairly attributable to the State.

The Court recognized in *Estelle:* "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." 429 U.S., at 103, 97 S. Ct., at 290. In light of this, the Court held that the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated. *Id.,* at 104, 97 S. Ct., at 291. . . .

It is only those physicians authorized by the State to whom the inmate may turn. Under state law, the only medical care West could receive for his injury was that provided by the State. If Doctor Atkins misused his power by demonstrating deliberate indifference to West's serious medical needs, the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish West by incarceration and to deny him a venue independent of the State to obtain needed medical care. . . . [W]e conclude that respondent's delivery of medical treatment to West was state action fairly attributable to the State, and that respondent therefore acted under color of state law for purposes of § 1983.

487 U.S. at 54-57 (internal footnotes omitted).  The Tenth Circuit has applied the reasoning in *West* in determining that a doctor working for the State was acting under color of law in a § 1983 equal protection and free expression case.  *Nieto v. Kapoor*, 268 F.3d 1208, 1216 (10th Cir. 2001); *see also Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1337-39 (N.D. Okla. 2014).

*West* seems to be directly on point.  In their response, plaintiff cited the reasoning in *Revilla* and noted parenthetically that *Revilla* relied in part upon *West*, yet CHC does not mention, much less attempt to distinguish, the case, its holding, or its analysis.  Rather, CHC argues only generally in reply that the plaintiff's "allegations are insufficient to show that [CHC] exerted influence over a state entity, substituted its judgment for a state entity, or participated in the decisions leading to the alleged deprivations of rights."  (Doc. 26 at 2).  The Court disagrees,

and finds that the plaintiff has plausibly averred "conduct [by CHC that] is fairly attributable to the State" for purposes of § 1983. *See West*, 487 U.S. at 54.[2]

### 4. Municipal Liability Theory

CHC also argues that plaintiff cannot maintain a § 1983 claim against CHC under a municipal liability theory because CHC was not a final policymaker for the Jail. Municipal employers cannot be held liable under § 1983 on a *respondeat superior* theory. *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691-92 (1978). To establish municipal liability, a plaintiff must ultimately demonstrate (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. that "there is a direct causal link between the policy or custom and the injury alleged"). *Id*. at 694-95; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Thus, when a state actor deprives a person of a constitutional right, municipal liability may be found when "the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002) (quoting *Monell*, 436 U.S. at 690). A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell*, 436 U.S. at 694, or for an action by an authority with final policymaking authority, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482-83 (1986) (plurality opinion). *See also Seamons v. Snow*, 206 F.3d 1021, 1029 (to establish municipal liability, plaintiff must show "that the unconstitutional actions of an employee were representative of an official policy or custom of the

---

[2]     CHC continues to regurgitate arguments that this Court has previously addressed, while ignoring the analyses in the Court's prior opinions which reject these repeat arguments. CHC's failure to address *West* is but one example. For the same reasons the Court has previously rejected CHC's "color of law" argument in prior cases, that argument is again rejected here.

municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action").

The Tenth Circuit has described several types of actions which may constitute a municipal policy or custom:

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson*, 627 F.3d at 788 (citations omitted).

While the Supreme Court has applied *Monell* to municipalities, the Circuit Courts of Appeal have applied *Monell* to private entities, acting under color of law, that are sued under 42 U.S.C. § 1983. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216, n.13 (10th Cir. 2003). Thus, private corporations may not be held liable under § 1983 based upon respondeat superior, but may only be held liable where their policies caused a constitutional violation. *See Dubbs*, 336 F.3d at 1216.[3]

The Complaint asserts that CHC was charged with implementing and assisted in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Jail and shared responsibility with Glanz to adequately train and supervise its employees.

---

[3] The Seventh Circuit recently called into question the reasoning behind applying *Monell* to private corporations. *See Shields v. Illinois Dept. of Corrections*, 746 F.3d 782 (7th Cir. 2014). This Court has noted that the reasoning of *Shields* and its thorough analysis of Supreme Court precedent provides potent arguments for *not* extending *Monell* to private corporations like CHC. However, the Court is bound to follow Tenth Circuit precedent, and the settled law in all Circuits to have decided the issue is that *Monell* extends to private corporations and thus they cannot be held liable on a respondeat superior basis for their employees' conduct. Thus, to state a § 1983 claim against CHC, plaintiff must satisfy *Monell*.

Plaintiff further alleges that CHC knew or it was obvious that the policies, practices, and customs posed substantial risks to the health and safety of inmates' like plaintiff, but failed to take reasonable steps to alleviate those risks in deliberate indifference to their serious medical needs. According to plaintiff, CHC and the Sheriff are responsible for longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Jail, they have long known of these systemic deficiencies and the substantial risks to inmates like plaintiff, but have failed to alleviate the deficiencies and risks. Plaintiff also alleges specific notice to CHC from 2007-2011 of findings, in audit reports by the National Commission on Correctional Health Care, the Oklahoma Department of Health, the United States Department of Homeland Security's Office of Civil Rights and Civil Liberties (CRCL), and the Jail's own medical auditor, which found significant problems with the system of care provided at the Jail.

According to the assertions in the Complaint, notice of those problems allegedly included a 2011 finding by the CRCL that there was a "prevailing attitude among clinic staff of indifference," but CHC did nothing to remedy that prevailing indifference among its employees. These allegations assert a plausible § 1983 claim against CHC based upon its alleged policies, customs, or practices under *Monell* and its progeny.

CHC relies heavily upon *Pembaur* and asserts that the Complaint must be dismissed because plaintiff cannot establish that CHC had final policymaking authority at the Jail. As noted above, however, *Pembaur* provides an alternative means of establishing municipal liability where an action by an official with final policymaking authority is alleged to establish the constitutional violation. *See Pembaur*, 475 U.S. at 480, 482-83. That form of establishing municipal liability is *in addition to* the settled method of showing that the entity's policy was the moving force behind the denial of a constitutional right. *See Monell*, 436 U.S. at 694. The

distinction has been cited in countless cases, and it is clear that a municipal liability claim may be founded on *either* basis. *See, e.g., Simmons v. Uintah Health Care Spec. Dist.*, 506 F.3d 1281, 1284-85 (10th Cir. 2007) (identifying separate bases under *Monell* and *Pembaur*); *Seifert v. Unified Gov't of Wyandotte Cty.*, 779 F.3d 1141, 1159 (10th Cir. 2015) (municipality is responsible for both actions taken by subordinate employees in conformance with preexisting policies or customs and actions by final policymakers whose conduct is the official policy of a municipality).

### 5. Constitutional Deprivation

CHC contends that plaintiff has not alleged facts that arise to a constitutional deprivation. However, it is well-established that inmates have a constitutional right to necessary medical care, "including psychological or psychiatric care," and when prison officials are deliberately indifferent to such needs, they violate the inmate's right to be free from cruel and unusual punishment. *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996); *Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980). In the Complaint, plaintiff alleges that, acting pursuant to policies, practices, and customs of CHC and the Sheriff, nurse Claxton, who was acting as the gatekeeper, was deliberately indifferent to Mr. Ray's serious medical and mental health needs and ignored obvious risks to his personal safety by placing him in general population, leading directly to his injuries. While plaintiff may not ultimately be able to prove as a matter of fact the direct causal link or the necessary mental state to satisfy deliberate indifference, the Court concludes at this time that plaintiff's allegations in the Complaint, which must be taken as true, state a plausible claim for a deprivation of Mr. Ray's constitutional rights.

### 6.     Prison Litigation Reform Act (PLRA)

CHC argues that the suit should be dismissed for failure to comply with the exhaustion requirement of the PLRA.  Here, again, CHC merely repeats arguments that have long been rejected.  In a prior, published decision of this Court, which involved CHC as well as CHC employees, the Court plainly rejected the argument reasserted by CHC here:

> The Healthcare Defendants argue that "Ms. Revilla fails to allege that she exhausted all available administrative remedies before bringing this lawsuit" and that she therefore "fails to state a claim upon which relief can be granted and her claims ... must be dismissed" for failure to comply with the PLRA. (Doc. 21 at 13–16). There are two problems with this argument. First, "a plaintiff who seeks to bring suit about prison life after he has been released and is no longer a prisoner does not have to satisfy the PLRA's exhaustion requirements before bringing suit." *Norton v. City of Marietta, Okla.,* 432 F.3d 1145, 1150 (10th Cir.2005) (citing and agreeing with decisions of other Circuits). Plaintiffs assert that Ms. Revilla was not in custody at the time the Amended Complaint was filed and the PLRA therefore does not apply. Defendants did not reply to that assertion. Pursuant to *Norton* and the plain language of the PLRA, in the absence of evidence that Ms. Revilla was a "prisoner confined in a jail" at the time she brought suit, the Court finds that she was not required to comply with the exhaustion requirements of the PLRA. Second, assuming that Ms. Revilla was required to exhaust under the PLRA before bringing suit, dismissal is not appropriate for a failure to plead such exhaustion. *Jones v. Bock,* 549 U.S. 199, 216, 127 S. Ct. 910, 166 L.Ed.2d 798 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Defendants did not cite *Jones* or provide any argument as to why the case should not apply.

*Revilla v. Glanz*, 8 F.Supp.3d 1336, 1345 (N.D. Okla. 2014).  A virtually identical analysis applies to CHC's argument here, including the failure of CHC to address *Jones*.  Although CHC's motion was filed in this case seven months after the foregoing decision in *Revilla*, CHC has not bothered to discuss it or provide any argument or authorities in support of a different result.  In light of the foregoing, CHC's PLRA argument is frivolous, and it is, once again, rejected.

7.    **Punitive Damages**

CHC argues that, even though it is a private corporation, it should be afforded the immunity from punitive damages that is afforded to municipalities. It cites no authority that is directly on point, instead relying upon Tenth Circuit authorities which generally hold that *Monell* principles apply to private corporations who are considered to be state actors for purposes of § 1983. *Monell* does not address the specific issue of punitive damages, and the Tenth Circuit authorities cited by CHC also do not specifically determine whether punitive damages may be recovered in a § 1983 suit against a private entity. In response, plaintiff cites a handful of authorities from other Circuits in which courts have determined that punitive damages may be recovered under § 1983 against private corporations.

In *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), the Supreme Court held that local governments are immune from punitive damages under § 1983. That holding was based, in part, on considerations uniquely applicable to governments. For example, the Court observed that the purposes of retribution and deterrence would not be satisfied because "punitive damages imposed on a municipality . . . are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill" and "[n]either reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers." 453 U.S. at 267-70. In addition, "[t]o add the burden of exposure for the malicious conduct of individual government employees may create a serious risk to the financial integrity of these governmental entities." *Id.* at 270. "[T]he unlimited taxing power of a municipality may have a prejudicial impact on the jury, in effect encouraging it to impose a sizable award. . . and we are sensitive to the possible strain on local treasuries and therefore on services available to the public at large." *Id.* at 270-71.

The specific question presented by CHC's argument is whether the Supreme Court's holding in *City of Newport* should be extended to preclude recovery of punitive damages against a private entity such as CHC. As noted, CHC has presented no legal authority directly on point, and plaintiff cites a few authorities in which district courts determined that punitive damages may be recovered against a private entity in a § 1983 suit. In *Segler v. Clark County*, 142 F. Supp. 2d 1264 (D. Nev. 2001), the court determined that EMSA, a private corporation acting under color of law, could be subjected to punitive damages under § 1983. The court reasoned that, as a private corporation,

> EMSA does not fit the requirements for a municipality set out . . . in the *City of Newport* case. Although EMSA is a state actor through its contract [with the police department], the award of punitive damages against EMSA would not punish taxpayers in the way such a decision would affect a municipality. Instead, punitive damages would be assessed against EMSA which would bear the burden of payment as a private corporation. Also the deterrence effect of an award of punitive damages would impact EMSA as a private corporation influencing the possible future actions by EMSA or its employees.

*Segler*, 142 F. Supp. 2d at 1269.

Applying *Segler*, the court in *Lawes v. Las Vegas Metro. Police Dept.*, No. 2:12-CV-1523, 2013 WL 3433150 (D. Nev. 2013), denied a motion to dismiss an inmate's punitive damages claim under § 1983 against a private entity providing medical care in a detention center. Similarly, in *Gee v. Bloomington Hospital*, No. 1:06-cv-94-TWP-TAB, 2012 WL 639517 (S.D. Ind. Feb. 27, 2012), the court determined that a private hospital, which contracted with a sheriff to provide medical care to jail inmates, was not entitled to immunity from punitive damages because "municipal immunity from punitive damages does not extend to private organizations that contract with the municipality to perform a function previously performed by the municipality." *Id.* at * 12 (quoting 2 Punitive Damages: Law and Prac., § 15:23).

Without providing any specific legal analysis of whether a private entity is entitled to immunity from punitive damages, the Seventh Circuit upheld a $1.5 million punitive damages award against Correctional Medical Services (CMS) in a § 1983 suit by the estate of a pretrial detainee who committed suicide in a county jail. *Woodward v. Correctional Med. Serv. of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir. 2004). In *Woodward*, the district court denied CMS's request for remittitur, and the Seventh Circuit noted that "there is ample evidence for the jury to conclude that CMS was deliberately indifferent to the risk of suicide within the jail" by virtue of a "routine disregard for policies and procedures which was condoned by CMS management." *Id.* The court also remarked that the evidence reflected that "[n]urses were not properly trained" and that CMS's regional director and its health services administrator "refused to refer ill patients to the hospital in order to save money." *Id.* According to the Seventh Circuit, all of the evidence "established a corporation that had little regard for the inmates whose care it was charged with," supporting a punitive damages award against CMS. *Id.* The Seventh Circuit upheld the punitive damages award against the private corporation, even though it applied *Monell's* municipality requirements to CMS.

As the Court previously stated in *Revilla*, based on the foregoing and the reasoning of *City of Newport*, "the Court is unable to apply the punitive damages immunity afforded municipalities ... to CHC, which is a private corporation." 8 F. Supp. 3d at 1343. "The reasoning of *City of Newport* seems largely hinged upon the fact that the traditional purposes of punitive damages (punishment and deterrence) would not be served by imposing punitive damages upon local governments, because taxpayers would foot the bill, governments would likely have to increase taxes or reduce public services, and such an award would place the local government's financial integrity in serious risk." *Id.* (citing *City of Newport*, 453 U.S. at 267-

70).  Those same purposes do not apply to a private corporation.  Accordingly, CHC's motion to

dismiss the request for punitive damages is denied at this time.[4]

### 8.    Negligence

CHC argues that plaintiff's negligence claim must be dismissed because it is immune

under § 152(7)(b)(7) of the Governmental Tort Claims Act (GTCA).  That section provides:

> For the purpose of The Governmental Tort Claims Act, the following are
> employees of this state, regardless of the place in this state where duties as
> employees are performed: ... (7) *licensed medical professionals under contract*
> *with city, county, or state entities who provide medical care to inmates or*
> *detainees in the custody or control of law enforcement agencies....*

*Okla. Stat.* tit. 51, § 152(7)(b)(7) (emphasis added).  CHC thus argues that it is immune from suit

under *Okla. Stat.* tit. 51, § 152. 1, which generally provides that "[t]he state, its political

subdivisions, and all of their employees acting within the scope of their employment ... shall be

immune from liability for torts."  In response, plaintiff argues that CHC itself is not considered

the state or a political subdivision of the state pursuant to legal authorities applying the GTCA.

Plaintiff also contends that CHC is not a "licensed medical professional" such that it could be

defined as an "employee" within the meaning of § 152(7)(b)(7).

The Court previously discussed CHC's argument for immunity under § 152(7)(b)(7), in

*Revilla*, stating as follows:

> The Healthcare Defendants reply that plaintiffs' assertions "are without merit,"
> because the statute "is clearly meant to include a correctional healthcare provider
> such as CHC and its employees and/or agents who are licensed medical
> professionals."  The Healthcare Defendants did not provide any specific
> information or argument in response to plaintiffs' contentions. For example, they
> have *not* (1) provided any information to show that the individuals have contracts
> with Tulsa County (or to explain the specific relationship of the individuals with
> CHC such that they may be considered "under contract" with Tulsa County), (2)

---

[4]    Again, although the Court addressed the same argument by CHC in *Revilla*, 8 F. Supp. 3d
at 1342-43, CHC has not mentioned it, distinguished any of the authorities cited on the point
therein, or made a good faith argument for a different result than the Court reached in *Revilla*.

identified any legal authority to show that the individual licensed medical professionals may be considered to have contractual privity with Tulsa County, (3) described in what manner CHC itself could be considered to be a "licensed medical professional" under the statute, or (4) provided any statutory construction argument or analysis to support their position. In fact, CHC did not provide any information as to the specific employment status of the individual Healthcare Defendants at all, except to point out the plaintiffs' allegations that they are "employees or agents" of CHC. That reliance only upon the allegations of the Amended Complaint makes sense, given that, at the pleading stage, the Court will confine its review to the pleadings. But it also points to a conclusion that it is premature at this stage for the Court to dismiss the negligence claims against the Healthcare Defendants. *See, e.g., Briggs v. Okla. Dept. of Human Servs.,* 472 F.Supp.2d 1294, 1299 (W.D.Okla.2007) ("Absent proof of the facts deemed relevant by the parties, the status of EO Youth Services and Bonner as employees or as an independent contractor and the employee of an independent contractor, respectively, *1345 cannot be decided at this stage of the litigation [under the OGTCA].... the Court finds that until these defendants' status is resolved that discussion of the immunity provided by the OGTCA ... to employees is premature").

*Revilla*, 8 F. Supp. 3d at 1344-45. For the same reasons, the Court will not determine at this time that CHC is immune, where no information has been provided about its (or its employees') status. The determination is better suited for the summary judgment stage, upon a proper record.

CHC also asserts that plaintiff did not comply with the affidavit of merit requirement of *Okla. Stat.* tit. 12, § 19.1, which generally requires that a plaintiff alleging professional negligence "shall attach to the petition an affidavit attesting" that plaintiff consulted with an expert, obtained a written opinion that a reasonable interpretation of the facts supports a finding that the defendant's actions constitute negligence, and that plaintiff thus concluded the claim is meritorious and based on good cause.[5] Upon a failure to do so or obtain an extension of time, upon motion by the defendant, a court shall dismiss the negligence claim without prejudice. *Id.*

---

[5] CHC actually cited a predecessor statute, *Okla. Stat.* tit. 12, § 19, which was repealed effective December 9, 2013, after having been determined to be unconstitutional. The essential terms of the statute were enacted in § 19.1 that same date, and the Court will accordingly reference that section herein.

CHC correctly notes that some federal judges in Oklahoma have treated the prior state affidavit of merit pleading requirement (§ 19) to be substantive, such that Oklahoma law must apply. *See, e.g., Fhici v. U.S. ex rel. Dep't of Veterans Affairs*, No. 10-CV-725-GKF-TLW, 2011 WL 2551535 (N.D. Okla. Jun. 27, 2011), rev'd on other grounds, 528 F. App'x 796 (10th Cir. 2013); *Norman v. U.S. ex rel. Dep't of Veterans Admin. Med. Ctr.*, No. CIV-12-663-C, 2013 WL 425032 (W.D. Okla. Feb. 4, 2013). At least one judge in this District has concluded otherwise and determined that the affidavit of merit is a procedural pleading rule that conflicts with the notice pleading required by Fed. R. Civ. P. 8 and therefore declined to dismiss an action for a failure to comply with § 19.1. *See Doe v. Defendant A*, No. 12-CV-392-JHP-TLW, 2012 WL 6694070 (N.D. Okla. Dec. 21, 2012). Another judge in this District recently declined to address a plaintiff's argument that § 19.1 "is a rule of procedure that does not apply to cases in federal court," but dismissed a negligence claim without prejudice (on other grounds) and permitted leave to file an amended complaint with an affidavit of merit attached. *See Horan v. Detello*, No. 15-CV-51-CVE-PJC, 2015 WL 4132908 (N.D. Okla. Jul. 8, 2015).

The Court recognizes that there are differing judicial views on Oklahoma's affidavit requirement. Notwithstanding authority to the contrary, the undersigned tends to agree with Judge Payne's analysis that the affidavit requirement is procedural and conflicts with Fed. R. Civ. P. 8's notice pleading requirement. Federal Rules of Civil Procedure 8, 12(b)(6), and 56 are procedural rules. Rules 8 and 12(b)(6) apply at the pleading stage and expressly do *not* require any proof of the validity or merit of the allegations asserted in the Complaint. As construed by *Twombly* and *Iqbal*, Rule 12(b)(6) only requires the pleading of enough facts to state a plausible claim for relief, and those rules do not require a plaintiff alleging any claim to "attach" anything to a complaint filed in federal court. Proof and affidavits are generally not required to be

submitted until the summary judgment stage, when Rule 56 applies. *See* Fed. R. Civ. P. 56 (party must support factual assertions with materials that may include affidavits).

Moreover, assuming the affidavit of merit requirement is substantive, it was not effective until December 9, 2013, after Mr. Ray's injuries, and CHC does not cite any authority establishing that such a substantive requirement would be retroactively applicable to a suit based upon injuries incurred prior to the statute's effective date.[6]  At least one Oklahoma district judge declined to dismiss a suit under § 19.1, in part, because a court "could also find that § 19.1 does not apply to plaintiff's claims because it was enacted after plaintiff's claims arose." *Caballero v. Safeco Ins. Co. of America, Inc.*, No. CIV-14-1336-M, 2015 WL 1731631, at *2 (W.D. Okla. Apr. 14, 2015).  Given the conflicted state of the law regarding Oklahoma's statutory affidavit requirement, the Court declines to dismiss plaintiff's negligence claim against CHC at this time.

### C.     Sharissa Claxton, LPN

Ms. Claxton moves for dismissal on many of the same grounds raised by CHC. Specifically, she asserts the same arguments as CHC relating to PLRA exhaustion, color of law, constitutional deprivation, and tort immunity.  (*See* Doc. 14).  For the same reasons set forth above in denying CHC's dismissal motion, Claxton's dismissal motion will be denied.[7]

---

[6]     Although the prior version of the statute requiring the affidavit of merit (§ 19) was repealed on the date that § 19.1 was enacted, the Oklahoma Supreme Court had previously determined § 19 to be unconstitutional. *See Wall v. Marouk*, 302 P.3d 775, 777-79 (Okla. 2013); *Douglas v. Cox Ret. Props., Inc.*, 302 P.3d 789, 793-94 (Okla. 2013).

[7]     Parts of Ms. Claxton's motion appear to be arguments or briefing that may have been filed in a separate case.  For example, in her dismissal motion, she purports to quote the plaintiff's Complaint as alleging that "[plaintiff] 'reported Defendant Claxton's sexual harassing conduct to employees of the [TCSO] and CHC/CHM/CHMO' and 'reported the sexual assault by Defendant Claxton....'" (Doc. 14 at 11) (purporting to cite Doc. 2 at ¶¶ 17, 20).  The Complaint in this case does not involve any allegations of sexual harassment or sexual assault by Claxton, and those paragraphs of the Complaint do not correspond to those allegedly quoted in Claxton's brief.

### D.     Sheriff Stanley Glanz

#### 1.     Statute of Limitations

In his dismissal motion, Sheriff Glanz first asserts that plaintiff's claims should be dismissed as time-barred, because plaintiff relies in part upon events or failures during the booking process on September 21, 2012, but did not file suit until over two years later on September 24, 2014.[8]  Plaintiff responds that the constitutional claim did not accrue until Mr. Ray was seriously injured on September 24, 2012, which was when plaintiff first had reason to know of the injury that is the basis of the action.  (Doc. 31 at 10) (citing *Baker v. Bd. of Regents*, 991 F.2d 628, 632 (10th Cir. 1993)).  Neither party has cited authorities that are plainly on point with the facts here, although it generally appears that Glanz may have a basis for disposition of any claim against him that is premised solely upon booking.  However, as Sheriff Glanz's own authorities reflect, such issues are more typically determined at the summary judgment stage. *See, e.g., Smith v. City of Enid*, 149 F.3d 1151 (10th Cir. 1998).

Moreover, the Complaint contains allegations that indicate that there were actions, after booking, that led to Mr. Ray's injuries, such that the § 1983 claim would be timely.  (*See, e.g.,* Doc. 2 at ¶ 24).  Plaintiff has also alleged a failure to properly staff and supervise the Jail so as to prevent the obvious risk of serious assault, which would not necessarily be time-barred because the assault occurred within the statute of limitations period.  (See Doc. 2 at ¶ 21).  At this time, the Court declines to determine, as a matter of law at the pleading stage, that plaintiff's § 1983 claim is time-barred.  The motion to dismiss is denied to the extent based upon the statute of

---

[8]     Plaintiff's § 1983 claims are governed by a two-year statute of limitations, which is the period governing personal injury claims under Oklahoma law.  *See Okla. Stat.* tit. 12, § 95(A)(3); *Price v. Philpot*, 420 F.3d 1158, 1162 (10th Cir. 2005).

limitations. However, the denial is without prejudice to that defense being reasserted and determined at the summary judgment stage upon a full record.

### 2. Individual Capacity

Glanz next contends that the Complaint does not state a claim against him in his individual capacity. Plaintiff's claims against Glanz in his individual capacity are premised upon so-called supervisory liability. Supervisory liability under § 1983 may not be premised upon a theory of respondeat superior. *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (citing *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013)). "[M]ere negligence is insufficient to establish supervisory liability." *Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999). To succeed on a supervisory liability theory, a plaintiff "must show an 'affirmative link' between the supervisor and the constitutional violation." *Booker*, 745 F.3d at 435 (quoting *Schneider*, 745 F.3d at 767). To show that link, "three elements [are] required to establish a successful § 1983 claim against a defendant based upon his or her supervisory responsibilities: (1) personal involvement; (2) causation; and (3) state of mind." *Schneider*, 717 F.3d at 767.

Although federal courts appear to uniformly agree that the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) imposes a stricter liability standard for the personal involvement required for supervisor liability, the Tenth Circuit has not yet determined the precise contours of that standard. *See, e.g., Booker*, 745 F.3d at 435 (noting the contours of the personal involvement requirement "are still somewhat unclear after *Iqbal* ... [but] [w]e need not define those contours here...."). The Tenth Circuit has not overruled its post-*Iqbal* decision that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a

policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights ... secured by the Constitution....'" *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

A recent Tenth Circuit decision holds that, in one class of jail cases (jail suicide), the state of mind element is not established in the absence of proof that the supervisor had "knowledge that the specific inmate at issue" was at substantial risk. *See Cox v. Glanz*, __ F.3d __, 2015 WL 5210607 at *15 n.11 (10th Cir. 2015) (distinguishing *Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008), on the ground that, in *Tafoya*, the Circuit took "a different stance on the knowledge of risk that must be alleged" when it "held that a prison 'official's knowledge of the risk [of sexual assault on a prisoner] need not be knowledge of a substantial risk to *a particular* inmate, or knowledge of the particular manner in which injury might occur."). The *Cox* decision also rejected statements in an earlier decision, *duBois v. Payne Cty. Bd. of Cty. Comm'rs*, 543 F. App'x 841 (10th Cir. 2013), which cited the *Tafoya* standard as applicable in a jail suicide case. *See Cox*, at *15 n.11.

The *Tafoya* statement regarding deliberate indifference, 516 F.3d at 916, was premised upon and cited statements in *Farmer v. Brennan*, 511 U.S. 825, 842-44 (1994), which involved a prison beating and rape, but has been cited as controlling authority in countless factual contexts. In *Farmer*, the Supreme Court stated that a prison official may *not* "escape liability for deliberate indifference":

> by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner

faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

511 U.S. at 842-44 (internal citation omitted).

While, in jail suicide cases, the Tenth Circuit has apparently rejected *Farmer*'s statement of the way in which the deliberate indifference standard may be satisfied, *see Cox*, 2015 WL 5210607 at *15 n.11, that opinion does not indicate that the Circuit would consider *Farmer* (or *Tafoya*) inapplicable in a case involving a physical attack, like that involved here. Indeed, in *Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999), which involved claims against an Oklahoma sheriff for failing to protect a pretrial detainee from assault by other inmates and for alleged indifference to the detainee's medical needs, the Tenth Circuit denied the sheriff's summary judgment motion upon evidence that the sheriff was aware of a substantial risk of serious harm from understaffing and a lack of supervision and surveillance at the jail:

> [Plaintiff] argues ... that his injuries resulted from constitutionally infirm conditions at the jail. We consider first Sheriff LeMaster's individual liability for these conditions. To survive summary judgment on his individual claim against Sheriff LeMaster, appellant must present factual evidence that he was "incarcerated under conditions posing a substantial risk of serious harm," *see Farmer*, 511 U.S. at 834, 114 S. Ct. 1970, and that the sheriff was aware of and disregarded an excessive risk to inmate health or safety by failing to take reasonable measures to abate the risk, *see id.* at 847, 114 S. Ct. 1970.

*Lopez*, 172 F.3d 756, 760-61 (10th Cir. 1999).

The Tenth Circuit in *Lopez* further quoted *Farmer* and noted that the sheriff would not be relieved from liability simply because he was unaware of a specific risk to the plaintiff:

> *Even if Sheriff LeMaster was unaware of the specific risk to appellant from his cellmates, this does not relieve him from liability.* "[A] prison official [may not] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843, 114 S. Ct. 1970.

*Lopez*, 172 F.3d at 762 n.5. 172 F.3d at 762 n.5 (emphasis added).[9]

Accordingly, the discussion herein applies *Farmer*'s deliberate indifference analysis, rather than the "*particularized* state of mind" standard identified in *Cox* as applicable to jail suicide cases, which would require proof of "actual knowledge by a prison official of [the substantial risk] to" a "specific inmate." 2015 WL 5210607 at **13, 15.

Among other things, plaintiff alleges in the Complaint that: at the time of Mr. Ray's injury, Glanz was responsible for creating and enforcing regulations, policies, practices, and customs at the Jail; pursuant to those practices, policies, and customs, the Jail maintained a longstanding, constitutionally deficient system of medical and mental health care; that Glanz knew of the substantial risks created by that system but failed to take reasonable steps to alleviate the risks; and actually took intentional and active steps to conceal the dangerous conditions at the Jail. (Doc. 2 at ¶¶ 7, 18, 27-49). Plaintiff also alleges that the assault of Mr. Ray was of such length and severity as to show that "there was virtually no supervision provided for Mr. Ray," and Glanz disregarded the known and obvious risk of severe harm from lack of adequate mental health assessment and treatment, classification, supervision, or protection, and that such lack of supervision and protection was "also consistent with a policy or custom at the Jail of understaffing and overcrowding." (*Id.* at 21). At the pleading stage, these allegations must be taken as true, and they are sufficient to state a claim against Glanz in his individual capacity.

Glanz also asserts that he is entitled to qualified immunity. In resolving questions of § 1983 qualified immunity (at the summary judgment stage), courts engage in a two-pronged

---

[9]     Although the Tenth Circuit in *Cox* declined to recognize or apply, in the jail suicide context, *Farmer*'s statement of the manner in which deliberate indifference may be proven, the Circuit in *Cox* actually cited *Farmer*, 511 U.S. at 837 in its statement of the "deliberate-indifference rubric." *See Cox*, 2015 WL 5210607 at *12. *Cox* also cited *Lopez* with approval in reciting part of the standard applicable to a prison official's responsibility for the safety of prisoners. *Cox*, at *12. *Lopez* has not been overruled.

inquiry. *Tolan v. Cotton,* __ U.S. __, 134 S. Ct. 1861, 1865-68 (2014) (per curiam). The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" *Id.* (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)); *see also York v. City of Las Cruces,* 523 F.3d 1205, 1209 (10th Cir. 2008). The second prong asks "whether the [federal] right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). Government officials are shielded from liability if their actions did not violate clearly established federal rights "of which a reasonable person would have known." *Id.* (quoting *Hope,* 536 U.S. at 739). "'[T]he salient question ... is whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Id.* (quoting *Hope,* 536 U.S. at 741). The courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

At the time Mr. Ray was beaten in the Jail shower, it was clearly established in the law that the Eight Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including "adequate food, clothing, shelter, and medical care," and to "take reasonable measures to guarantee the safety of the inmates." *Farmer,* 511 U.S. at 833.[10] "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834. As a result, a "*prison official may be held liable ... if the official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.*"

---

[10]     The protection afforded convicted inmates under the Eighth Amendment is afforded to pretrial detainees under the Fourteenth Amendment Due Process Clause. *Lopez,* 172 F.3d 756, 759 n.2 (10th Cir. 1999).

*Farmer*, 511 U.S. at 847 (emphasis added). This standard has both objective and subjective components. The alleged constitutional deprivation must objectively be "sufficiently serious," such that the risk of harm was serious. *Id.* at 834. The official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. That knowledge may be proved "in the usual ways, including inference from circumstantial evidence, and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

As discussed previously, a prison official does not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault," and "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 842-44.

*Farmer* clearly established that a "prison official may be held liable ... if the official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. *Farmer* specifically dealt with the alleged beating and rape of a prisoner by another prisoner and allegations that prison officials failed to protect the prisoner and prevent such harm. *See id.* The constitutional rights identified in *Farmer* have been repeatedly recognized in Tenth Circuit assault and sexual assault cases predating Mr. Ray's injuries. *See, e.g., Tafoya*, 516 F.3d at 916 (2008); *Howard v. Waide*, 534 F.3d 1227, 1242 (10th Cir. 2008) (rejecting claim that the constitutional right was not clearly established and stating that "[t]he Supreme Court and the Tenth Circuit have repeatedly and

unequivocally established an inmate's Eight Amendment right to be protected from substantial risks of sexual assault by fellow prisoners."); *Ramos*, 639 F.2d at 572 (1980) ("an inmate does have a right to be reasonably protected from constant threats of violence ... from other inmates").

Based upon the allegations in the Complaint (*see* discussion *supra*), Glanz is not entitled to qualified immunity at this time. Judging the individual capacity claim against Glanz at the pleading stage, the allegations of the Complaint sufficiently assert conduct by him, which (if true as must be assumed at this time) would make out a plausible claim for a violation of the constitutional rights that were clearly established in the law under *Farmer* and its progeny.[11]

### 3.	Official Capacity

Plaintiff's official capacity claim is treated like a claim for municipal liability. An official capacity claim represents one way of asserting "an action against an entity of which [the] officer is an agent." *Monell*, 436 U.S. at 690, n.55. Such claims are treated as claims against the County itself. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Lopez*, 172 F.3d at 762 ("[Plaintiff]'s suit against Sheriff LeMaster in his official capacity as sheriff is the equivalent of a suit against Jackson County, [Oklahoma].").

---

[11]	Assertions of qualified immunity are more typically addressed at the summary judgment stage, although courts will consider such assertions at the dismissal stage. *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). Asserting a qualified immunity defense at the dismissal stage subjects the defendant raising it to a more challenging standard than would apply at the summary judgment stage, because of the different standards that apply to Rule 56 and 12(b)(6) motions. *See id.*; *Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008); *Choate v. Lemmings*, 294 F. App'x 386, 390-91 (10th Cir. 2008) (unpublished). The undersigned recently granted an Oklahoma sheriff's summary judgment motion in a Jail assault case. *See* Case No. 12-CV-169-JED (Doc. 231). The facts developed in the evidentiary summary judgment record there were different than those alleged in this case. (*See id.*). However, like in that case, if the evidence ultimately does not bear out what plaintiff alleges in his Complaint in this case (i.e. the evidence ultimately does not show that Glanz deliberately disregarded a known or obvious, serious risk to inmate safety, causing injury to Mr. Ray), summary judgment will be granted to Glanz.

A municipality or county may not be held liable under § 1983 solely because its employee inflicted injury; such liability cannot be found by application of the theory of respondeat superior. *Monell*, 436 U.S. at 691, 694. "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1359 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Thus, to establish municipal liability under § 1983, a plaintiff must show "1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). The requirement of a policy or custom distinguishes the "acts of the municipality from acts of employees of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479 (emphasis in original).

Here, plaintiff alleges that the Sheriff was responsible for a policy, practice, or custom of maintaining a longstanding, constitutionally deficient medical and mental health care, which placed inmates like Ray at substantial risk, and that there was little to no supervision of Ray and inmates like him, because of a policy or custom of understaffing and overcrowding. Plaintiff also alleges that Ray's injuries were caused by the operation of those longstanding policies, customs, and practices. At the pleading stage, this is sufficient to state a *Monell* claim under § 1983.

### 4. Oklahoma Constitution

Plaintiff's Complaint asserts a claim under article 2, § 9 of the Oklahoma Constitution. (Doc. 2 at 21-22). Glanz moved to dismiss that claim, and plaintiff acknowledges that a claim under § 9, which is the state equivalent of the United States Constitution's Eighth Amendment, is not appropriate because Mr. Ray was a pretrial detainee at the time he was injured. Glanz's motion to dismiss the claim under art. 2, § 9 will be granted.

Plaintiff requests leave to amend to include a state constitutional claim under Okla. Const. art. 2, § 7 (which is the state's Due Process Clause equivalent). As leave to amend shall be freely granted under Fed. R. Civ. P. 15(a)(2), plaintiff may amend the Complaint to add a claim under art. 2, § 7.

### 5. Punitive Damages on the Official Capacity Claim

Glanz correctly notes that a plaintiff may not recover punitive damages on a § 1983 claim against a municipality, under *City of Newport*, 433 U.S. at 271. In response, plaintiff asserts that she does not intend to seek punitive damages on the official capacity claim. To the extent that the Complaint may be read to request punitive damages on the official capacity claim, the motion to dismiss will be granted.

## III. Conclusion

For the foregoing reasons, the dismissal motions filed by the CHM defendants (Doc. 15), CHC (Doc. 16), and Sharissa Claxton (Doc. 14), are **denied**. Stanley Glanz's motion to dismiss (Doc. 21) is hereby **granted in part and denied in part**, as set forth above. The plaintiff is granted leave to amend to add a claim under art. 2, § 7 of the Oklahoma Constitution; no other amendments shall be included. Any amendment shall be filed by October 14, 2015. To the

extent that such amendment is filed, the Court will entertain *only* dismissal arguments by or on behalf of Glanz directed to that amendment.

IT IS SO ORDERED this 30th day of September, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE