**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) BRENDA KAY SANDERS, as Guardian of CHARLES RAY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 14-CV-569-JED-FHM ) |
| (1) STANLEY GLANZ, SHERIFF OF TULSA COUNTY, in His Individual and Official Capacities; | ) ) ) ATTORNEY LIEN CLAIMED |
| (2) CORRECTIONAL HEALTHCARE MANAGEMENT OF OKLAHOMA, INC., | ) JURY TRIAL DEMANDED ) |
| (3) CORRECTIONAL HEALTHCARE MANAGEMENT, INC. | ) ) |
| (4) CORRECTIONAL HEALTHCARE COMPANIES, INC., and | ) ) |
| (5) SHARISSA CLAXTON, LPN, | ) ) |
| Defendants. | ) |

**AMENDED COMPLAINT**

**COMES NOW**, Brenda Kay Sanders ("Plaintiff"), as Guardian of Charles Ray

("Mr. Ray"), who is incapacitated, by and through her attorneys of record, and for her

causes of action against the Defendants, alleges and states as follows:

**INTRODUCTORY STATEMENT**

1. Mr. Ray was booked into the David L. Moss Criminal Justice Center (hereinafter

"Tulsa County Jail") on September 21, 2012. Upon booking, Mr. Ray advised medical

staff that he suffered from serious mental health disorders and was taking antipsychotic

drugs, including Risperdal, which is prescribed for treatment of bi-polar disorder.

Indeed, Mr. Ray specifically informed the booking nurse that he had, just months prior,

been treated for serious mental health disorders at the Jail and been prescribed

antipsychotic medication by Jail medical staff. A simple review of Mr. Ray Jail medical

records revealed a history of suicidal ideation as well as erratic, psychotic and combative behavior.   In fact, Dr. Stephen Harnish, the Jail's lone psychiatrist, had previously diagnosed Mr. Ray with mood disorders and personally prescribed Mr. Ray several antipsychotic medications.

2.   Nevertheless, in violation of applicable policy and standards, the booking nurse assigned Mr. Ray to a general population pod and failed to refer Mr. Ray to any mental health specialist or otherwise take any action to assure that Mr. Ray's serious mental health needs were met.

3.   On September 24, 2012, while housed in the general population, Mr. Ray was the subject of a serious and vicious assault from other inmates that left him severely and permanently injured. The assault on Mr. Ray occurred in the shower of the Jail.  It is clear that Mr. Ray was not properly classified and his serious mental health needs were not adequately assessed or treated.   As an inmate with serious and known mental health needs, Mr. Ray was not adequately supervised or monitored, resulting in an utter failure to protect Mr. Ray from obvious risks of serious harm. The assault in the shower went on for so long that it nearly killed Mr. Ray and left him permanently incapacitated.  The length of the assault and the severity of the injuries indicate that there was virtually no supervision provided for Mr. Ray.  Defendants disregarded the known and obvious risk that severe harm could result to Mr. Ray from lack of adequate mental health assessment and treatment, classification, supervision or protection. Defendants simply failed to provide Mr. Ray with adequate supervision and care and failed to take other measures to protect him from physical harm, in deliberate indifference to Mr. Ray's health and safety.

4.   Adding insult to injury, after Mr. Ray was severely beaten, the Tulsa County Sheriff's Office ("TCSO") intentionally released Mr. Ray -- purportedly by way of his Own Recognizance ("OR") -- so that the County would not be responsible for Mr. Ray's extensive medical bills. However, Mr. Ray never signed an OR release and did not give consent for one to be signed. In fact, Mr. Ray was incapable of giving informed consent after he was found nearly beaten to death and was severely brain damaged. Releasing inmates by way of false "OR", in order to avoid medical costs, is a common practice, amounting to a policy or custom, within the Jail.  This is an unconstitutional, and unconscionable, policy or custom, which plainly exhibits deliberate indifference to the health and safety of inmates like Plaintiff.

5.   Mr. Ray fell victim to a culture of indifference toward inmate health, safety and well-being.  Consistent with established policies, practices and/or customs, Defendants failed to provide Mr. Ray with adequate mental health assessment and treatment, classification, supervision or protection, in deliberate indifference to his health and safety.

## JURISDICTION AND VENUE

6.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

7.   The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the

Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

8.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

9.   Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

<u>**PARTIES**</u>

6.   At all pertinent times, Mr. Ray was a resident of Tulsa County, Oklahoma.

7.   Defendant Stanley Glanz ("Sheriff Glanz" or "Defendant Glanz") is, and was at all times relevant hereto, the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of state law.  Defendant Glanz, as Sheriff and the head of the Tulsa County Sheriff's Office ("TCSO"), was, at all times relevant hereto, responsible for ensuring the safety and well-being of inmates detained and housed at the Tulsa County Jail, including the provision of appropriate medical and mental health care and treatment to inmates in need of such care, pursuant to 57 O.S. § 47.  In addition, Defendant Glanz is, and was at all times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of TCSO and Tulsa County Jail, including the policies, practices, procedures, and/or customs that violated Mr. Ray's rights as set forth in this Complaint.  Defendant Glanz is sued in his individual and official capacities.

8.   During all pertinent time periods, Defendant Correctional Healthcare Management of Oklahoma, Inc. ("CHMO") was a foreign corporation doing business in

Tulsa County, Oklahoma and was at all times relevant hereto responsible, in part, for providing medical services and medication to Mr. Ray while he was in the custody of TCSO. CHMO was additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees. CHMO was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that CHMO became an agency or instrumentality of the State and subject to its constitutional limitations.

9. During all pertinent time periods, Defendant Correctional Healthcare Companies, Inc. ("CHC") was a foreign corporation doing business in Tulsa County, Oklahoma and was at all times relevant hereto responsible, in part, for providing medical services and medication to Mr. Ray while he was in the custody of TCSO. CHC was additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees. CHC was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that CHC became an agency or instrumentality of the State and subject to its constitutional limitations.

10. During all pertinent time periods, Defendant Correctional Healthcare Management, Inc. ("CHM") was a foreign corporation doing business in Tulsa County, Oklahoma and was at all times relevant hereto responsible, in part, for providing medical services and medication to Mr. Ray while he was in the custody of TCSO. CHM was additionally responsible, in part, for creating and implementing policies, practices and

protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees.  CHM was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that CHM became an agency or instrumentality of the State and subject to its constitutional limitations.

11. Defendant Sharissa Claxton, LPN ("Nurse Claxton") was at all time relevant hereto, an employee and/or agent of CHC/CHM/CHMO, and acting under color of state law. Nurse Claxton was in part, responsible for overseeing Mr. Ray's health and well-being, and assuring that his medical and/or mental health needs were met, during the time he was in the custody of TCSO. Nurse Claxton is being sued in her individual capacity.

## FACTUAL ALLEGATIONS

## A.      FACTS SPECIFIC TO MR. RAY

12. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 11, as though fully set forth herein.

13. Prior to September 2012, Mr. Ray had been incarcerated at the Jail.  Once in the summer of 2011 and again in the spring of 2012.

14. During his summer 2011 incarceration, Mr. Ray was evaluated by medical staff for mental health problems.  On June 16, 2011, Mr. Ray reported to medical staff at the Jail that he had attempted suicide in the past.  He was placed in a suicide cell, his clothes were removed Mr. Ray began beating on the cell door.  He was yelling that he wanted to kill himself and had nothing to live for. On June 17, 2011, Dr. Stephen Harnish, the lone psychiatrist at the Jail, prescribed several antipsychotic drugs for Mr. Ray to treat a "mood disorder". Also on June 17, Mr. Ray reported to medical staff that he was

depressed, having racing thoughts and could not sleep.   On June 20, 2011, Mr. Ray reported that he was "hearing voices".

15. In April of 2012, Mr. Ray was booked into the Jail again.   During the booking process, Mr. Ray reported to medical staff that he suffered from a mood disorder and had a current history of mental health treatment.   On April 22, 2012, Mr. Ray submitted a mental health kiosk request stating, "I NEED TO SEE THE DR SO I CAN GET BACK ON MY MEDS IM REALLY FREAKING OUT."   On April 30, 2012, *eight (8) days after the kiosk request*,  Mr. Ray was seen by Dr. Harnish.  Dr. Harnish noted that Mr. Ray had mood swings, racing thoughts, sleeplessness and rapid speech.  Dr. Harnish diagnosed Mr. Ray with a mood disorder and prescribed antipsychotic medication.

16. Mr. Ray was booked into Jail a third time on September 21, 2012.  Upon booking, Mr. Ray advised medical staff, specifically Nurse Claxton, that he suffered from serious mental health disorders and was taking antipsychotic drugs, including Risperdal, which is prescribed for treatment of bi-polar disorder.  Indeed, Mr. Ray specifically informed the booking nurse, Nurse Claxton, that he had, just months prior, been treated for serious mental health disorders at the Jail and been prescribed antipsychotic medication by Jail medical staff.  A simple review of Mr. Ray's Jail medical records would have revealed the above-described history of suicidal ideation as well as erratic, psychotic and combative behavior. As noted, Dr. Harnish, the Jail's lone psychiatrist, had previously diagnosed Mr. Ray with mood disorders and personally prescribed Mr. Ray several antipsychotic medications.

17. TCSO policy requires that inmates are to be classified in a way that provides safe, humane inmate treatment by housing inmates together with similar characteristics.  The

7

policy further requires the classification officer to privately interview the inmate to determine any "history of mental illness".

18. The Oklahoma Jail Standards provide that inmates who are mentally ill "shall be separated from other prisoners" and that the Jail shall make "[e]very effort…to contact a local hospital, clinic or mental health facility for the detention of the mentally ill." OAC 310:670-5-5(6).  The Oklahoma Jail Standards also require that "[t]hose individuals who appear to have a significant medical or psychiatric problem, or who may be a suicide risk, shall be transported to the supporting medical facility as soon as possible" and "shall be housed separately in a location where they can be observed frequently by the staff at least until the appropriate medical evaluation has been completed…." OAC 310:670-5-8(2).

19.  Nevertheless, in violation of these, and other, applicable policies and standards, Mr. Ray was merely assigned to a general population pod by Nurse Claxton and other responsible personnel.  Mr. Ray was not referred to any mental health specialist.  No action was taken to assure that Mr. Ray's serious mental health needs were met. Mr. Ray was not housed separately in a location where he could be observed frequently by the staff at least until the appropriate medical evaluation had been completed.

20. On September 24, 2012, just three (3) days after being sent to a general population pod, Mr. Ray was viciously attacked by other inmates in the shower. He was found lying on the floor, with gross bleeding from his head, face, mouth and left side of his skull. His left eye was completely swollen shut.

21. The assault in the shower went on for so long that it nearly killed Mr. Ray and left him permanently incapacitated.  The length of the assault and the severity of the injuries indicate that there was virtually no supervision provided for Mr. Ray.   Defendants

disregarded the known and obvious risk that severe harm could result to Mr. Ray from lack of adequate mental health assessment and treatment, classification, supervision or protection.  The lack of supervision and protection of Mr. Ray is also consistent with a policy or custom at the Jail of understaffing and overcrowding at the Jail.

22.  EMSA was called to take Mr. Ray to the hospital. Despite Mr. Ray's serious and critical head injuries, Jail personnel, specifically Nurse Raymond Stiles, described Mr. Ray's condition as "fair". He was then released from custody upon "OR" despite being completely incoherent and incapable of consenting to the release. This is consistent with TSCO's policy or custom of releasing inmates as "OR" in order to avoid paying their medical bills despite their injuries occurring during incarceration and as a result of Defendants' deliberate indifference to inmate health and safety.

23. Nurse Claxton, and the other booking staff at the Jail, served as gatekeepers for other professionals capable of treating Mr. Ray's condition.  Nurse Claxton, and the other booking staff at the Jail utterly failed in performing this gatekeeper role.  In violation of applicable policies and standards, and in disregard for the substantial risks to his health and safety, Nurse Claxton, and the other booking staff at the Jail simply ran Mr. Ray through the booking process and placed him in a general population cell.  Despite his known and serious mental health care problems, Mr. Ray was not provided with any mental health care, monitoring or supervision whatsoever.

24.  While Mr. Ray should not have been sent to a general population cell to begin with, once placed there, medical and correctional staff should have been on high alert due to the substantial risks to Mr. Ray's safety.  However, as evidenced by the beating he received in shower, Mr. Ray was provided utterly inadequate, or non-existent,

supervision and protection, in deliberate indifference to his health and safety.  It was known or obvious that Mr. Ray's serious mental health problems, including his extreme mood swings, posed a significant danger of harm if Mr. Ray were left unmonitored with other violent inmates.  These risks were disregarded, and Plaintiff suffered mightily as a result.

25. Defendants' deliberate indifference to the known or obvious risks to Mr. Ray's physical health, safety and well being was a direct and proximate cause of his injuries and resulting permanent brain damage.

## B.    FACTS PERTAINING TO APPLICABLE POLICIES OR CUSTOMS

26. The deliberate indifference to Mr. Ray's health and safety, as summarized *supra*, was in furtherance of and consistent with: (a) policies, customs and/or practices which Sheriff Glanz promulgated, created, implemented or possessed responsibility for the continued operation of; and (b) policies, customs and/or practices which CHC/CHM/CHMO developed and/or had responsibility for implementing and which CHC/CHM/CHMO.

27.   There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail.  Sheriff Glanz and CHC/CHM/CHMO have long known of these systemic deficiencies and the substantial risks to inmates like Mr. Ray, but have failed to take reasonable steps to alleviate those deficiencies and risks.

28. For instance, in 2007, the National Commission on Correctional Health Care ("NCCHC"), a corrections health accreditation body, conducted an on-site audit of the Jail's health services program.  At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to

perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies and failure to address health needs in a timely manner.  NCCHC made these findings of deficient care despite CHC/CHM/CHMO and Sheriff Glanz's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

29.  Sheriff Glanz and CHC/CHM/CHMO failed to change or improve any health care policies or practices in response to the NCCHC's findings.

30.  An August 2009 investigation of the suicide death of an inmate conducted by the Oklahoma Department of Health uncovered several violations of the Oklahoma Jail Standards.  Specifically, the Department of Health found: (a) "The inmate indicated a form of mental illness on his screening yet it appeared that the proper steps as required in the Jail Standards were not taken"; (b) the amount of time that the Jail allows for a mental health evaluation is in direct conflict with the Jail Standards; (c) the inmate was not properly segregated from the general population; (d) the inmate received an inappropriate medical evaluation; and (e) the inmate was not, but should have been, housed in an area for more frequent observations. *See* Oklahoma State Department of Health Report on Death Investigation (Jernegan), 8/3/09.

31.  As with the NCCHC findings in 2007, the Department of Health findings in 2009 strongly signaled that inmates with mental health problems were being put at excessive risk by inadequate assessments and untimely treatment. However, Sheriff Glanz and CHC/CHM/CHMO failed to take reasonable steps to alleviate the known and excessive risks.

32.  NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

33.  During the 2010 NCCHC audit process, CHC's Vice President of Accreditation orchestrated -- and was directly involved in -- the falsification of records and doctoring of files at the Tulsa County Jail for the purpose of defrauding the NCCHC auditors.

34. Despite CHC/CHM/CHMO's efforts to defraud the auditors, the NCCHC once again found numerous serious deficiencies with the health services program.  As part of the final 2010 Report, NCCHC found, *inter alia*, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year…. The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "…diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented…"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and "… potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks.  Training for custody staff has been limited.  Follow up with the suicidal inmate has been poor."  2010 NCCHC Report (emphasis added).

35. Sheriff Glanz only read the first two or three pages of the 2010 NCCHC Report. Sheriff Glanz is unaware of any policies or practices changing at the Jail since the 2010 NCCHC Report was issued.   While CHC/CHM/CHMO submitted written corrective action plans in response to the 2010 NCCHC Report, CHC/CHM/CHMO had no intention of actually following the corrective action plans, and did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health identified by the NCCHC.

36. Importantly, the "physician"/"responsible physician" referred to in the 2010 NCCHC Report was Dr. Andy Adusei.  Thus, Defendants long knew that Dr. Adusei posed substantial risks to the health and safety of inmates with serious medical needs.

37. Over a period of many years, Tammy Harrington, R.N. ("Director Harrington") CHC/CHM/CHMO's former Director of Nursing ("DON") at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates.    The deficiencies observed and documented by Director Harrington include: chronic failure to triage inmates' requests for medical and mental health assistance; doctors (particularly, Dr. Adusei and Dr. Washburn) refusing/failing to see inmates with life-threatening conditions; CHC/CHM/CHMO's Health Services Administrator ("HSA") repeatedly instructing staff to alter and falsify medical records; a chronic lack of supervision of clinical staff; and repeated failures of CHC/CHM/CHMO to alleviate known and significant deficiencies in the health services program at the Jail.  Director Harrington reported the deficiencies to CHC/CHM/CHMO, but CHC/CHM/CHMO took no meaningful action to correct the deficiencies.

38. Robin Mason ("Nurse Mason"), a registered nurse, and graduate of the University of Texas School of Nursing, resigned from her employment at the Jail on October 19, 2010 after making repeated complaints to CHC/CHM/CHMO of delays in inmate mental health care due to the incompetence and indifference of certain medical personnel. Nurse Mason's complaints fell on deaf ears, as CHC/CHM/CHMO made no effort to alleviate the deficient care provided at the Jail.

39. On September 29, 2011, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported their findings in connection with an audit of the Jail's medical system as follows: ***"CRCL found a <u>prevailing</u> <u>attitude</u> among clinic staff of <u>indifference</u>…."***; "*Nurses are undertrained*. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to *lack of training and supervision*"; "Found two … detainees with clear mental/medical problems that have not seen a doctor."; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years". "ICE-CRCL Report, 9/29/11 (emphasis added).

40. Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

41. On the contrary, less than 30 days after the ICE-CRCL Report was issued, on October 27, 2011, another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency.

42. After Mr. Williams died, Director Harrington provided CHC/CHM/CHMO with documentation of systemic deficiencies within the Jail's medical program that likely contributed to his death, including chronic delays in responding to inmates' serious medical and mental health needs.  However, neither CHC/CHM/CHMO nor Sheriff Glanz made any meaningful improvements to the medical system.  This is evidenced by the fact that yet another inmate, Mr. Brown, died due to grossly deficient care just months after Mr. Williams.

43. On November 18, 2011, AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality" and issues with "nurses acting beyond their scope of practice [which] increases the potential for preventable bad medical outcomes."  AMS-Roemer Report, 11/8/11 (Ex. 25) at CHM0171-72.  AMS-Roemer specifically commented on no less than six (6) inmate deaths (including the death of Mr. Jernegan), finding deficiencies in the care provided to each.  *Id.* at CHM0168-69; 0171.

44. It is clear that Sheriff Glanz and CHC/CHM/CHMO did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC and CHC policies "to get patients to providers," and "[n]ot enough training or supervision of nursing staff."  Corrective Action Review at CHM1935 – 1938. During an April 2012

audit, Dr. Roemer found that nurses were not providing timely triage of mental health requests and that they needed "education in mental health sick call triage…." Ltr. frm. Herr to Roemer, 6/13/12 at CHM1973 – 1975.

45. There is a well-established policy, practice and/or custom of understaffing the Jail failing to adequately assess, treat and supervise inmates with serious mental health needs.

46. There is a continuing policy or custom of overcrowding the Jail and failing to protect inmates with serious mental health needs.

47. There an unconstitutional, and unconscionable, policy or custom at the Jail of releasing inmates with serious medical or mental health needs as "OR" so that TCSO could avoid responsibility for medical costs, which plainly exhibits deliberate indifference to the health and safety of inmates like Plaintiff.

48. Sheriff Glanz continued to retain CHC/CHM/CHMO as the Jail's medical provider long after many serious deficiencies with the Jail's medical program had repeatedly been brought to light.

49. As alleged herein, there are deep-seated and well-known policies, practices and/or customs of systemic, dangerous and unconstitutional failures to provide adequate medical and mental health care to inmates at the Tulsa County Jail. This system of deficient care -- which evinces fundamental failures to train and supervise medical and detention personnel -- created substantial, known and obvious risks to the health and safety of inmates like Mr. Ray. Still, Sheriff Glanz and CHC/CHM/CHMO failed to take reasonable steps to alleviate the substantial risks to inmate health and safety, in deliberate indifference to Mr. Ray's health and safety.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Cruel and Unusual Punishment in Violation of the Eighth
and Fourteenth Amendments to the Constitution of the United States
(42 U.S.C. § 1983)**

**A.      Allegations Applicable to all Defendants**

50. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 49, as though fully set forth herein.

51. Defendants knew or it was obvious that there was a strong likelihood that Mr. Ray was in danger of serious injury and harm as set forth herein.

52. Defendants failed to provide an adequate mental health care and supervision to Mr. Ray while he was placed at the Tulsa County Jail.

53. Defendant's acts and/or omissions as alleged herein, including but not limited to their failure to provide Mr. Ray with adequate supervision, delayed response and/or to take other measures to protect him from physical harm, constitute deliberate indifference to Mr. Ray's health and safety and resulted in his permanent injury.

54. As a direct and proximate result of Defendant's conduct, Mr. Ray experienced physical pain, severe emotional distress, mental anguish, permanent injury, and the damages alleged herein.

55. The aforementioned acts and/or omissions of the individually named Defendants were malicious, reckless and/or accomplished with a conscious disregard of Mr. Ray's rights thereby entitling Plaintiff to an award of exemplary and punitive damages according to proof.

17

**B.      Supervisor and Official Capacity Liability (Sheriff Glanz)**

56. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 55, as though fully set forth herein.

57. The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Mr. Ray's health and safety and violating Mr. Ray's civil rights were the direct and proximate result of customs, practices and policies which Sheriff Glanz promulgated, created, implemented and/or possessed responsibility for.

58. Such policies, customs and/or practices are specifically set forth in paragraphs 26-49, supra.

59. Sheriff Glanz, through his continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to inmates', including Mr. Ray's, health and safety.

60. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Ray suffered injuries and damages as alleged herein.

**C.    Municipal Liability (CHC/CHM/CHMO)**

61. Ms. Revilla re-alleges and incorporates by reference paragraphs 1 through 60, as though fully set forth herein.

62. CHC/CHM/CHMO are "persons" for purposes of 42 U.S.C. § 1983.

63. At all times pertinent hereto, CHC/CHM/CHMO were acting under color of state law.

64. CHC/CHM/CHMO were endowed by Tulsa County with powers or functions governmental in nature, such that CHC/CHM/CHMO became an instrumentality of the State and subject to its constitutional limitations.

65. CHC/CHM/CHMO were charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and have shared responsibility to adequately train and supervise their employees.

66. There is an affirmative causal link between the aforementioned deliberate indifference to Mr. Ray's serious medical needs, health, and safety, and violations Mr. Ray's civil rights, and the above-described customs, policies, and/or practices carried out by CHC/CHM/CHMO.

67. CHC/CHM/CHMO knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Ray. Nevertheless, CHC/CHM/CHMO failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Ms. Ray's, serious medical needs.

68. CHC/CHM/CHMO tacitly encouraged, ratified, and/or approved of the unconstitutional acts and/or omissions alleged herein.

69. There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Ms. Ray's injuries and damages as alleged herein.

## SECOND CLAIM FOR RELIEF

### Negligence
### (Defendants CHC, CHM, CHMO and Claxton)[1]

70. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 69, as though fully set forth herein.

71. CHC/CHM/CHMO and Nurse Claxton owed a duty to Mr. Ray, and all other inmates in custody, to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

72. CHC/CHM/CHMO and Nurse Claxton breached that duty by failing to provide Ms. Revilla with prompt and adequate mental health treatment despite Mr. Ray's obvious needs.

73. CHC/CHM/CHMO and Nurse Claxton's breaches of the duty of care include, *inter alia*: failure to treat Mr. Ray's serious medical and mental health condition properly; failure to conduct appropriate medical and mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly evaluate Mr. Ray's physical and mental health; failure to properly monitor Mr. Ray's physical and mental health; failure to provide access to medical and mental health

---

All Plaintiffs' tort claims are properly brought against CHMO/CHM/CHC and its employees or agents. The Oklahoma Supreme Court held in *Sullins v. American Medical Response of Oklahoma, Inc.,* 23 P.3d 259, 264 (Okla. 2001), that a private entity such as CHMO/CHM/CHC is not an "entity designated to act in behalf of the State or political subdivision [which includes a public trust]" for the purposes of the exemption under 51 Okla. Stat. § 152(2), merely because it contracts with a public trust to provide services which the public trust is authorized to provide. *See also Arnold v. Cornell Companies, Inc.,* 2008 WL 4816507 (W.D.Okla., Oct. 29, 2008).

personnel capable of evaluating and treating his serious health needs; and a failure to take precautions to prevent Mr. Ray from further injury.

74.  As a direct and proximate cause of CHC/CHM/CHMO and Nurse Claxton's negligence, Mr. Ray experienced physical pain, severe emotional distress, mental anguish, permanent impairment and the damages alleged herein.

75. As a direct and proximate cause Defendants' negligence, Mr. Ray has suffered real and actual damages, including medical expenses, mental and physical pain and suffering, emotional distress, lost wages and other damages in excess of $75,000.00.

76. CHC/CHM/CHMO are vicariously liable for the negligence of their employees and agents, including Nurse Claxton.

77. CHC/CHM/CHMO are also directly liable for their own negligence.

## THIRD CLAIM FOR RELIEF

**Violation of Article II § 9 of the Constitution of the State of Oklahoma
Cruel and Unusual Punishment and Deliberate Indifference**

78.  Plaintiff re-alleges and incorporates by reference paragraphs 1 through 77, as though fully set forth herein.

79. Article II § 9 of the Oklahoma Constitution prohibits the infliction of cruel and unusual punishment.  Under the Oklahoma Constitution's Due Process Clause, Article II § 7, the right to be free from cruel and unusual punishment extends to pre-trial detainees, like Mr. Ray, who have yet to be convicted of

a crime (in addition to convicted prisoners who are clearly protected under Article II § 9).

80. The protections afforded to pre-trial detainees under Oklahoma Constitution's Due Process Clause, Article II § 7, include the provision of adequate mental health care and protection from assault while in custody.

81. As set forth herein, Mr. Ray was denied adequate mental health care and denied sufficient supervision and protection and suffered a severe physical assault that left him permanently injured. Defendants violated the rights of Mr. Ray by failing to provide him with prompt and adequate supervision, failing to intervene to prevent further injury, overpopulating the jail, and understaffing the jail despite the obvious need.

82. At all times relevant, the jail personnel described in this Complaint were acting within the scope of their employment and under the direct control of Defendant Glanz, the Sheriff of Tulsa County and/or CHC/CHM/CHMO.

83. Defendants' failure to supervise and provide adequate mental health care and protection to Mr. Ray was the direct and proximate cause of Mr. Ray's permanent injury, physical pain, severe emotional distress, mental anguish, and all other damages alleged herein.

WHEREFORE, based on the foregoing, Plaintiff prays that this Court grant her the relief sought including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

Respectfully submitted,

Smolen, Smolen & Roytman, PLLC

/s/Daniel E.Smolen_____
Donald E. Smolen, OBA #19944
donaldsmolen@ssrok.com
Daniel E. Smolen, OBA #19943
danielsmolen@ssrok.com
Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone:  (918) 585-2667
Fax:  (918) 585-2669

**ATTORNEYS FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 14th day of October 2015, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/ Daniel E. Smolen___